**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MIDBROOK FLOWERBULBS HOLLAND B.V., *Plaintiff-Appellee*, v. HOLLAND AMERICA BULB FARMS, INC., a Washington corporation, *Defendant-Appellant*. | No. 14-36085 D.C. No. 3:14-cv-05409-RJB OPINION |

Appeal from the United States District Court
for the Western District of Washington
Robert J. Bryan, Senior District Judge, Presiding

Argued and Submitted May 8, 2017
Seattle, Washington

Filed October 25, 2017

Before:  Carlos T. Bea and N. Randy Smith, Circuit Judges,
and William Q. Hayes,* District Judge.

Opinion by Judge Bea

---

* The Honorable William Q. Hayes, United States District Judge for the Southern District of California, sitting by designation.

## SUMMARY[**]

**Uniform Foreign-Court Money Judgments Recognition Act**

The panel affirmed the district court's order granting summary judgment in favor of Midbrook Flowerbulbs Holland B.V., and denying Holland America Bulb Farms, Inc.'s discovery request under Fed. R. Civ. P. 56(d), in Midbrook's diversity action seeking recognition of an Amsterdam Court of Appeals judgment under Washington's Uniform Foreign-Country Money Judgments Recognition Act ("UFCMJRA").

Holland America, a Washington company, purchased flower bulbs from Midbrook, a Dutch company, and Midbrook obtained a judgment against Holland America in Dutch court. On appeal, Holland America alleged that proceedings in the Dutch courts which led to the Dutch judgment were "not compatible with the requirements of due process of law" under section 4(c)(8) of the UFCMJRA.

Concerning the legal standard governing the issue at hand, the panel held that the commentary and prefatory notice to the UFCMJRA demonstrated that under section 4(c)(8), courts need ask only whether the party resisting judgment "was denied fundamental fairness in the particular proceedings leading to the foreign-country judgment," not whether the foreign proceedings literally conformed to the requirements of due process under the U.S. Constitution.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that it was not necessary to decide whether process accorded to Midbrook also passed muster under American standards of due process.

The panel held that the Dutch courts' treatment of Holland America's discovery requests were a mere "procedural difference" that was insufficient to establish that the Dutch proceedings were fundamentally unfair. The panel further held that Holland America was not denied due process when the Amsterdam Court of Appeal overturned the Alkmaar District Court's factual finding denying the existence of the parties' alleged October 1999 settlement agreement because the Court of Appeal gave a good reason for overturning the finding. In addition, the panel held that Holland America failed to establish that even the more exacting standards of constitutional due process would have required a United States appellant court to defer to a trial court's factual determination under like circumstances.

Finally, the panel held that the district court did not abuse its discretion by denying Holland America's motion for additional discovery under Fed. R. Civ. P. 56(d).

---

**COUNSEL**

Michael E. Haglund (argued) and Shenoa L. Payne, Haglund Kelley LLP, Portland, Oregon, for Defendant-Appellant.

Steven J. Wells (argued), Dorsey & Whitney LLP, Minneapolis, Minnesota; Peter S. Ehrlichman and Andrea C. Yang, Dorsey & Whitney LLP, Seattle, Washington; for Plaintiff-Appellee.

**OPINION**

BEA, Circuit Judge:

After the collapse of the Dutch Tulip Bubble of 1637, we've heard little about that flower's market. But it hasn't gone away.

This action grows out of a family business dispute: The Dutch shipper of tulip bulbs to his brother in America claims his brother shorted him. The dispute was litigated at three court levels in Holland. The shipper won. Now he comes to Seattle to enforce his judgment. Enforce it the district court did. The American importer-buyer appeals that judgment. He will lose.

## I. Background

### A. Factual Background

Holland America Bulb Farms, Inc. ("Holland America") is a Washington corporation that grows and sells tulips and other varieties of cut flowers. Its sole owners, Benno and Klazina Dobbe, founded Holland America together after immigrating to the United States from the Netherlands in 1980.

In 1994, Holland America began purchasing flower bulbs from Midbrook Flowerbulbs Holland, B.V. ("Midbrook"), a Dutch corporation in which Arie Dobbe, Benno's brother, was a manager and part owner. Midbrook purchased flower bulbs from farms in the Netherlands and elsewhere, packaged them for shipment, and exported them to Holland America's farm in Washington. Though Holland America and Midbrook never entered into a written agreement regarding payment, Benno and Arie orally agreed

that Holland America would pay Midbrook its "actual costs on a one to one basis plus a commission."

For each shipment, Midbrook sent Holland America an invoice in Dutch guilders.[1] Instead of paying these invoices directly to Midbrook in guilders, Holland America deposited a lump sum of dollars into a Dutch bank account in Midbrook's name (the "dollar account"). At "fixed intervals," Midbrook withdrew dollars from the dollar account, exchanged them into guilders, and then deposited them into a second Dutch bank account (the "guilder account"), which was also in its name. Then, when the invoices became due, Midbrook paid itself the invoiced amount of guilders from the guilder account. Midbrook regularly sent Holland America statements for the two accounts, and Holland America was responsible for ensuring that there were enough dollars in the dollar account to cover the periodic transfers to the guilder account.

Sometime in 1997, Benno Dobbe noticed that Midbrook's costs "appeared to be higher than the bulb import costs that [his] competitors were obtaining from other Dutch suppliers." Benno became suspicious that Midbrook was overcharging Holland America, and he asked Arie to provide documentation substantiating Midbrook's costs. Arie assured Benno that Midbrook's invoices were correct, but he refused to provide the requested documentation. In June 1999, the parties agreed that they would "terminate their relationship" the following year, but that Midbrook would "still handle the export of the flower bulb harvest [in the fall] of 1999." Between January 11 and May 22, 2000, Midbrook sent Holland America invoices for the 1999 harvest which totaled 3,211,568 guilders. Holland America

---

[1] The Netherlands did not adopt the Euro as its currency until 2002.

never deposited dollars into the dollar account sufficient to cover these invoices, and Midbrook overdrew the dollar account to pay itself for them.

## B. Procedural Background

### 1. Proceedings in the Alkmaar District Court

In 2002, Midbrook filed a lawsuit against Holland America in the Alkmaar District Court in the Netherlands, seeking payment for the 1999 harvest shipments. Holland America did not deny that it had not paid Midbrook for the 1999 harvest; rather, it argued that Midbrook had "invoiced [Holland America] for too high an amount for years," and that Holland America had "[over]paid more in total during the period from 1994 to August 2000 . . . than Midbrook had invoiced [for the 1999 harvest]." Though Holland America "provisionally estimated" the amount of the overcharge to be $4,434,387 (roughly 9 million guilders), it asked the court to "order Midbrook to provide its bookkeeping records for the years 1984 up to and including December 2000" so that Holland America could "more particularly specif[y]" its damages.

In a series of "judgments,"[2] four of which were "interlocutory" and one of which was final, the Alkmaar District Court rejected Holland America's counterclaim and entered judgment in Midbrook's favor. In its first interlocutory judgment, entered after the court had reviewed the parties' pleadings and briefs, the court made several rulings. First, it noted that Midbrook claimed in its briefing

---

[2] According to the parties, "[t]he Alkmaar District Court and Amsterdam Court of Appeal refer to interlocutory decisions as 'judgment[s].'"

"that it [had] agreed with [Holland America] on October 22, 1999 that [Holland America], after receiving a credit note in the amount of . . . 100,000 [guilders], would have no more right to compensation for damages from improper invoicing in the past." The court ruled that Midbrook would be given "the opportunity [] to provide evidence for [this] agreement."

Second, although the court agreed with Holland America that "in principle, [it is] Midbrook's responsibility to specify and justify its invoice[s]" with documentation, it noted that "the period for which Midbrook must specify and substantiate its invoice[s]" would depend on whether Holland America had settled its claims for the harvests of 1994–1998; if it had, then it would not be entitled to any discovery with respect to the invoices for that period. Thus, the court deferred ruling on the parties' remaining claims until after it had heard evidence on the alleged settlement agreement.

The district court entered its second interlocutory judgment after hearing from witnesses from both parties regarding the settlement agreement, which allegedly took place at a meeting between Benno and Arie Dobbe in October 1999 at Midbrook's offices in the Netherlands. Midbrook's witnesses were Johannes Elling, Midbrook's tax advisor; and Elisabeth Dobbe–Ruygrok, Arie Dobbe's wife and a secretary at Midbrook. Elling and Dobbe–Ruygrok both testified that they were present at the meeting when Benno and Arie agreed to settle Holland America's claims for 100,000 guilders. Holland America's two witnesses, Benno Dobbe and Hugo Dobbe (another of Benno's brothers), testified that no such agreement was reached at the meeting, and that they had come to the Netherlands only because Arie had promised them that they could examine

Midbrook's records, which Arie ultimately did not allow them to do. The district court found that Midbrook's witnesses were not credible[3] and therefore determined that no settlement agreement had been reached.

Having disposed of the settlement issue, the court proceeded to address the parties' claims regarding the invoices for the harvests of 1994–99. It directed Holland America to "specify the [] invoices [to which it objected] concretely, submitting them . . . and indicat[ing] which amounts Midbrook invoiced unjustifiably to [Holland America] and why." Then, the court explained, Midbrook would "be given the opportunity to respond" by "provid[ing] insight into the structure of the invoices" identified by Holland America with "documented evidence."

After receiving documents and additional briefing from the parties, the court entered its third interlocutory judgment. In that judgment, the court concluded that Holland America "ha[d] not complied with the recommendations of the court in its second interim judgment" with respect to Midbrook's invoices for the harvests of 1994–1998. Although Holland America had "submitted the invoices whose correctness it disputes" and had "state[d] the items that, in its opinion, [were] incorrect" with each invoice, it had "neglect[ed] to substantiate the basis for the amount of the claimed damages." Because of this failure, the district court

---

[3] For example, the court found it "[im]plausible" that Dobbe–Ruygrok "was in the room where the meeting took place," collecting the participants' coffee cups, "[at] precisely at the moment that Benno Dobbe [] agreed on behalf of [Holland America] to granting final discharge." Likewise, the court found it suspicious that Elling "refused to submit the [written] report that he had made of the [] meeting," despite the fact that "he wished to make use of it when [testifying]."

dismissed Holland America's counterclaim for the harvests of 1994–1998.

With respect to the 1999 harvest, the district court noted that Midbrook had provided only "cost summaries" explaining "the structure of its invoices." The court did not fault Midbrook for "not having submitted at this moment all the underlying documents concerning costs that it incurred for the 1999 harvest," however, because Holland America had specified which "cost items it disputed" only after the court had entered its second interlocutory judgment. The court then summarized Holland America's objections to 1999 harvest invoices,[4] and stated that Midbrook would be given "the opportunity to respond to [these objections] with documentation."

The district court entered its fourth interlocutory judgment after receiving Midbrook's responses. In that judgment, the district court addressed each of Holland America's objections to the 1999 harvest invoices in detail, rejecting some but granting others.[5] In total, the district court

---

[4] The disputed costs included, *inter alia*: (1) a charge for iris bulbs that were delivered to a third party before being passed on to Holland America, for which Holland America directly paid the third party; (2) charges for certain temperature recording equipment that Midbrook had purchased; (3) a tariff on bulbs imported from outside the Netherlands, which were allegedly not subject to Dutch tariffs; (4) a failure to credit Holland America for certain shipping discounts Midbrook received when it shipped multiple containers of bulbs together in one shipment; (5) an incorrect daily cost of keeping bulbs cool during storage; and (6) charges for loading the containers and completing paperwork.

[5] Specifically, the court found, *inter alia*, that: (1) "Midbrook . . . issued a complete credit to the guilder account for the bulbs that it had [] initially charged [Holland America] that came from [the third party];

concluded that Midbrook had wrongly charged Holland America 40,403 guilders for the 1999 harvest.

The court then explained how it would calculate Midbrook's damages. Because Midbrook had paid itself for the 1999 harvest by overdrawing the dollar account, Midbrook's damages were equal to "the overdraft position of the dollar account" in March 2004 (when Midbrook closed that account and converted the deficit into euros), less the amount that Midbrook had "wrongfully charged" to Holland America. In October 2006, after receiving some additional information from Midbrook regarding its bank statements, the district court entered its fifth and final judgment, in which it awarded Midbrook €1,033,291 (at the time, the equivalent of $1,250,592), plus any interest that had accrued since Midbrook converted the dollar account balance into euros in March 2004.

### 2. Proceedings in the Amsterdam Court of Appeal

Holland America then appealed the Alkmaar District Court's judgment to the Amsterdam Court of Appeal. On appeal, Holland America reiterated its argument that its overpayments for the harvests of 1994–1998 had more than

---

(2) Midbrook had not provided documentation of the cost of the temperature equipment, so the court "presume[d]" that Midbrook had overcharged Holland America for that equipment by 2,000 guilders; (3) Midbrook wrongfully charged Holland America for tariffs that were "not owed for bulbs that do not come from the Netherlands"; (4) Midbrook owed Holland America 2,593 guilders in shipping discounts, which it had failed to pass on to Holland America; (5) Holland America had failed to substantiate its claims that Midbrook had misrepresented cooling costs; and (6) Midbrook had overcharged Holland America 18,880 guilders in loading and paperwork costs.

compensated Midbrook for its shipments following the 1999 harvest. It also reiterated its discovery requests for documentation of the costs underlying Midbrook's invoices from 1994 through 2000, and it requested bank statements for the dollar and guilder accounts. Midbrook cross-appealed, arguing that the Alkmaar District Court had erroneously rejected its contention that the parties had settled Holland America's claims for the harvests of 1994–1998.

Like the Alkmaar District Court, the Amsterdam Court of Appeal entered a series of judgments, two of which were interlocutory and one of which was final. In its first interlocutory judgment, the Amsterdam Court of Appeal reversed the district court's determination that Holland America had not agreed to settle its claims for the harvests of 1994–1998. The court noted that "[i]t is an established fact that a credit was issued by Midbrook for an amount of [] 100,000 [guilders]," and that "[c]onsidering the relationship between the parties . . . , it is unlikely that Midbrook would not have demanded [] consideration 'in exchange' for this credit." Thus, "[unlike] the District Court," the court of appeal "consider[ed] [it] proven that the parties concluded [a] [settlement] agreement." In light of this finding, the court denied Holland America's requests for documentation substantiating the invoices for the harvests of 1994–1998.

The court of appeal also denied Holland America's discovery requests with respect to the 1999 harvest. The court explained that Holland America had been given a chance to "identify in concrete terms the specific costs that it had been invoiced against which its objections were [] directed"; that Midbrook had then "complied with its obligation to provide insights into the costs that it had []charged"; and that Holland America's "objections [were]

discussed one by one by the District Court." Thus, the court concluded, Holland America had already been given an opportunity to contest the correctness of the invoices for the 1999 harvest, and it was entitled to no further discovery on the issue.

As to the bank statements for the dollar and guilder accounts, the Amsterdam Court of Appeal agreed with Holland America that "in principle," it was "entitled to the full details of the dollar account and the [guilder] account relationship." Though the court noted that there was some evidence that Holland America had "regularly requested a 'dollar and guilder balance sheet' [from Midbrook]" and that Holland America therefore likely possessed these documents already, it nonetheless ordered Midbrook to produce the statements for two accounts for the period running from January 1994 to January 2000.

After Midbrook submitted the bank statements, the court of appeal entered its second interlocutory judgment. In that judgment, the court of appeal addressed several objections that Holland America had made to the bank account statements[6] and ordered Midbrook to submit corrected versions. It also denied Holland America's request that the court order Midbrook to produce "bank statements of the contra accounts to which the amounts in guilders were credited that arose as a result of the conversion of dollars in

---

[6] These included: that on two occasions, Midbrook had converted dollars to guilders at a higher exchange rate than the parties had agreed upon; that from October 1997, Midbrook had overcharged Holland America for interest by an average of 2%; and that Midbrook had omitted certain credits it owed to Holland America from the statement of the guilder account.

the dollar account into guilders."**7** "As Midbrook rightly brings forward," the court explained, "the [guilder] account statements currently submitted in the proceedings show exactly which amounts were entered into the [guilder] account in favor of [Holland America]."

The court entered its third and final judgment in September 2011, after Midbrook submitted corrected versions of the two bank account statements. The court found that, as a result of the corrections, the surplus in the guilder account on January 1, 2000 was 460,862 guilders—not 312,642 guilders as the district court had found—and it adjusted the amount of damages calculated by the district court to €959,324 plus interest and costs on appeal.

Finally, the court of appeal again addressed Holland America's requests for discovery:

> In its motion following the second interlocutory judgment, [Holland America] has argued that it is litigating with one hand tied to its back. It claims having no access to the evidence that Midbrook . . . [has] with regard to the dollar transactions, the dollar forward exchange contracts . . . , the costs of the forward exchange contracts, and bank statements of the contra accounts to which the amounts in guilders were credited that [were] conver[ted] [from] dollars in the dollar account into guilders. In short,

---

**7** Apparently, Holland America requested these statements so that it could verify that all of the dollars that Midbrook withdrew from the dollar account were converted into guilders and deposited into the guilder account.

> [Holland America] wishes to have Midbrook demonstrate that all cost items recorded by Midbrook in the [guilder] account have actually been incurred.

Because Holland America "fail[ed] to specify which items in the current account . . . should be substantiated with supporting evidence," however, the court concluded that its discovery request was "too general and must be denied."

### 3. Proceedings in the Supreme Court of the Netherlands

Holland America appealed the Amsterdam Court of Appeal's decision to the Supreme Court of the Netherlands. In December 2012, the supreme court summarily dismissed the appeal and ordered Holland America to pay the costs and fees of the appeal. Because Midbrook does not seek to enforce the supreme court's judgment in this action, these costs and fees are not at issue here.

### 4. Proceedings in the U.S. District Court for the Western District of Washington

In May 2014, Midbrook filed a diversity action against Holland America in the U.S. District Court for the Western District of Washington, seeking recognition of the Amsterdam Court of Appeal's October 2006 judgment (the "Dutch judgment") under Washington's Uniform Foreign-Country Money Judgments Recognition Act ("UFCMJRA"). *See* Wash. Rev. Code §§ 6.40A.010–6.40A.902. After Midbrook filed its complaint, Holland America served Midbrook with several discovery requests. "For the period of January 1, 1994 through December 31, 2000," Holland America requested copies of:

1.  [] all of the underlying cost records with regard to the purchase, processing and export of the flower bulbs delivered by plaintiff to defendant.

2.  [] the detailed dollar account transaction data, dollar forward exchange contracts, bank statements of the contra account in guilders, and the costs of forward exchange contracts related to the dollar account involving transactions by plaintiff and/or defendant.

3.  [] the detailed bank statements of the guilder account regarding all dollar exchange transactions performed by plaintiff and/or defendant.

Midbrook served Holland America with objections to all three requests and then moved for summary judgment.

Holland America opposed the motion, arguing that under section 4(c)(8) of the UFCMJRA, the district court "need not" recognize the Dutch judgment, because "[t]he specific proceeding in the [Dutch] court leading to the judgment was not compatible with the requirements of due process of law." Holland America also requested additional "time . . . to take discovery" under Federal Rule of Civil Procedure 56(d), asking again for discovery of Midbrook's "underlying costs records" and "banking records."

The district court granted Midbrook's motion for summary judgment and denied Holland America's request for additional discovery. Holland America then filed a motion for reconsideration, which the district court denied. In December 2014, the district court entered a final judgment in Midbrook's favor for €2,200,513 (the amount of the Dutch judgment plus interest for the period leading up to

December 2014).**[8]**   Holland America then timely filed this appeal.

## II. Standard of Review

We review *de novo* a district court's determination that a foreign-court money judgment does not qualify for nonrecognition under one of the UFCMJRA's discretionary exceptions. *See Naoko Ohno v. Yuko Yasuma*, 723 F.3d 984, 1001–02 (9th Cir. 2013). We review for abuse of discretion a district court's denial of a request under Rule 56(d) for additional time to take discovery to oppose a motion for summary judgment. *See Morton v. Hall*, 599 F.3d 942, 945 (9th Cir. 2010).

## III. Discussion

### A. The District Court Did Not Err by Granting Midbrook's Motion for Summary Judgment.

In 1962, the National Conference of Commissioners on Uniform State Laws ("NCCUSL") promulgated the Uniform Foreign Money-Judgment Recognition Act ("UFMJRA") to codify the states' rules regarding the recognition of foreign money judgments. *See* UFMJRA, Prefatory Note. The aim of this codification was to "make it more likely that judgments rendered in [the] state[s] [will] be recognized

---

**[8]** In August 2014, Holland America filed an action for "preliminary relief" in the Noord Holland District Court (formerly the Alkmaar District Court), in which it sought, *inter alia*, "the underlying documents for drawing up the invoices" for the 1999 harvest. The Noord Holland District Court noted that this same request had been repeatedly denied in the earlier Dutch-court proceedings, and it denied Holland America's request.

abroad." *Id.* In 2005, NCCUSL promulgated the Uniform Foreign-Court Money Judgments Recognition Act ("UFCMJRA") to update the 1962 act. *See* UFCMJRA, Prefatory Note. Washington adopted the updated UFCMJRA in 2009. *See* Wash. Rev. Code §§ 6.40A.010–6.40A.902.

Under section 4(a) of the UFCMJRA, when a party files an action seeking recognition[9] of a "foreign-country judgment," the court "*shall* recognize" that judgment if it "[g]rants or denies recovery of a sum of money; and . . . under the law of the foreign country where rendered, is final, conclusive, and enforceable." *See* Wash. Rev. Code §§ 6.40A.010–.030 (emphasis added). Once the party seeking recognition demonstrates that the foreign-country judgment satisfies these *prima facie* requirements, *see id.* § 6.40A.020(3), the burden shifts to the party resisting recognition to prove that a ground for nonrecognition applies. *See id.* § 6.40A.030(4).

Sections 4(b) and (c) of the UFCMJRA provide eleven grounds—three mandatory and eight discretionary—for a court to refuse to recognize a foreign-country judgment. *See* Rev. Code Wash. §§ 6.40A.030(2)–(3). Two of these grounds are relevant to this appeal: Section 4(b)(1) provides that "[a] court . . . *may not* recognize a foreign-country judgment if . . . the judgment was rendered *under a judicial system* that does not provide impartial tribunals or

---

[9] "Recognition of a judgment means that the forum court accepts the determination of legal rights and obligations made by the rendering court in the foreign country. Recognition of a foreign-country judgment must be distinguished from enforcement of that judgment. Enforcement of the foreign-country judgment involves the application of the legal procedures of the state to ensure that the judgment debtor obeys the foreign-country judgment." UFCMJRA § 4 cmt. 2.

procedures compatible with the requirements of due process of law." *See* Wash. Rev. Code § 6.40A.030(2)(a) (emphasis added). Section 4(c)(8), by contrast, provides that "a court *need not* recognize a foreign-country judgment if . . . [t]he *specific proceeding* in the foreign court leading to the judgment was not compatible with the requirements of due process of law." *See id.* § 6.40A.030(3)(h).

On appeal, Holland America does not argue that Midbrook has failed to make its *prima facie* showing that the Dutch judgment "[g]rants or denies recovery of a sum of money" and "is final, conclusive, and enforceable" under Dutch law. Nor does Holland America argue that the Dutch judicial system as a whole "does not provide . . . procedures compatible with the requirements of due process of law." Rather, it argues only that the "specific proceeding[s]" in the Dutch courts which led to the Dutch judgment were "not compatible with the requirements of due process of law" under section 4(c)(8). This is so, Holland America argues, for two reasons: first, the Alkmaar District Court and the Amsterdam Court of Appeal "denied [Holland America] access to a majority of Midbrook's cost records and therefore deprived it of the opportunity to provide any defense in the contract action"; and second, the Amsterdam Court of Appeal "arbitrarily and without basis overturned the Alkmaar District Court's credibility rulings regarding whether the parties had reached a settlement."

## 1. Legal Standard

As an initial matter, we must identify the legal standard that governs whether specific proceedings in a foreign court were "compatible with the requirements of due process of law" under section 4(c)(8). Holland America urges us to apply "American due process principles"—that is, to interpret the phrase "due process of law" as incorporating by

reference the requirements of the Due Process Clauses of the Fifth and Fourteenth Amendments. Midbrook, by contrast, argues for a more permissive, "international" standard of due process.[10] Because the parties ask us to interpret a provision of a Washington statute, we begin by looking to the decisions of the Washington courts. If those decisions are unavailing and the question is one of first impression, we must identify the result we think the Washington Supreme Court would reach if it were presented with the same question. *See Brunozzi v. Cable Commc'ns, Inc.*, 851 F.3d 990, 998 (9th Cir. 2017).

Washington's UFCMJRA does not define the phrase "due process of law," *see* Rev. Code Wash. § 6.40A.010 (defining certain terms used in the statute), and the Washington courts have not yet addressed the meaning of the phrase as used in section 4(c)(8). Nor has any state supreme court or any federal court of appeals addressed the phrase's meaning in section 4(c)(8) of any other state's version of the UFCMJRA. *See* Rev. Code Wash. § 6.40A.900 ("In applying and construing this uniform act, consideration must be given to the need to promote

---

**[10]** To be clear, Midbrook does not claim that any primary source of international law—such as a treaty or rule of customary international law—governs the process to which Holland America was entitled in the Dutch courts. Rather, Midbrook urges us to apply the "international concept of due process" formulated by the Seventh Circuit in interpreting the phrase "due process of law" in a similar provision of Illinois's UFMJRA. *See Society of Lloyd's v. Ashenden*, 233 F.3d 473, 477 (7th Cir. 2000). Though we find the reasoning of that case persuasive, we adopt the phrase "fundamental fairness" because that phrase—unlike the phrase "international due process"—appears in the commentary to the UFCMJRA.

uniformity of the law with respect to its subject matter among states that enact it.").

In the absence of any binding authority on point, the commentary to section 4 of the UFCMJRA is instructive:

> Subsection 4(c)(8) . . . allows the forum court to deny recognition to the foreign-country judgment if the court finds that the specific proceeding in the foreign court was not compatible with the requirements of *fundamental fairness.* . . . [I]t can be contrasted with subsection 4(b)(1), which requires the forum court to deny recognition to the foreign-country judgment if the forum court finds that the entire judicial system in the foreign country where the foreign-country judgment was rendered does not provide procedures compatible with the requirements of fundamental fairness. *While the focus of subsection 4(b)(1) is on the foreign country's judicial system as a whole, the focus of subsection 4(c)(8) is on the particular proceeding that resulted in the specific foreign-country judgment under consideration*. Thus, the difference is that between showing, for example, that there has been such a breakdown of law and order in the particular foreign country that judgments are rendered on the basis of political decisions rather than the rule of law throughout the judicial system versus a showing that for political reasons the particular party against whom the foreign-country judgment was entered was denied

> *fundamental fairness* in the particular proceedings leading to the foreign-country judgment.

UFCMJRA § 4 cmt. 12 (emphasis added). This comment states that section 4(c)(8) allows for nonrecognition of a foreign money judgment if "the specific proceeding in the foreign court was not compatible with the requirements of fundamental fairness." As an example, it gives a foreign proceeding in which judgment was entered against a "particular party" for "political reasons"; elsewhere, the comment states that "evidence of corruption" may also render a proceeding fundamentally unfair. *See id.* Nowhere does the comment cite our Constitution's Due Process Clauses or otherwise intimate that the phrase "due process of law" was intended literally to incorporate their requirements.

Moreover, by contrasting section 4(c)(8) with section 4(b)(1), the comment suggests that the phrase "compatible with the requirements of due process of law" has the same meaning in both provisions.[11] And as another comment to section 4 states, section 4(b)(1) uses the standard "stated

---

[11] Indeed, this reading is consistent with the presumption of consistent usage, a fundamental canon of statutory construction. *See, e.g.*, *Util. Air Reg. Group v. E.P.A.*, 134 S. Ct. 2427, 2441 (2014) ("One ordinarily assumes that identical words used in different parts of the same act are intended to have the same meaning." (citations and internal quotation marks omitted)); Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170–73 (West 2012).

authoritatively by the Supreme Court . . . in *Hilton v. Guyot*, 159 U.S. 113, 205 (1895)":[12]

> As indicated in [*Hilton*], a mere difference in the procedural system is not a sufficient basis for nonrecognition. . . . The focus of inquiry

---

[12] In *Hilton*, the Supreme Court first addressed the recognition of foreign judgments as a matter of "general" federal common law. *See Hilton*, 159 U.S. at 163 ("[W]hen, as is the case here, there is no written law upon the subject, the duty still rests upon the judicial tribunals of ascertaining and declaring what the law is . . . to determine the rights of parties to suits regularly broght [sic] before them."). Rejecting the argument that a French judgment should be denied recognition simply because French law provided for neither testimony under oath nor cross-examination of witnesses, *see id.* at 117, the Court explained:

> When an action is brought in a court of this country, by a citizen of a foreign country against one of our own citizens, to recover a sum of money adjudged by a court of that country to be due from the defendant to the plaintiff, and the foreign judgment appears to have been rendered by a competent court, having jurisdiction of the cause and of the parties, and upon due allegations and proofs, and opportunity to defend against them, and its proceedings are according to the course of a civilized jurisprudence, and are stated in a clear and formal record, the judgment . . . should be held conclusive upon the merits tried in the foreign court, unless some special ground is shown for impeaching the judgment, as by showing that it was affected by fraud or prejudice, or that by the principles of international law, and by the comity of our own country, it should not be given full credit and effect.

*Id.* at 205–06. After *Erie v. Tompkins*, 304 U.S. 64 (1938), state law—not *Hilton*—controls the recognition of foreign judgments in federal diversity cases like this one. *See Naoko Ohno v. Yuko Yasuma*, 723 F.3d 984, 990 (9th Cir. 2013); Restatement (Third) of the Foreign Relations Law of the United States § 481 cmt. a (1987).

> is not whether the procedure in the rendering country is similar to U.S. procedure, but rather on the basic fairness of the foreign-country procedure. Procedural differences, such as absence of jury trial or different evidentiary rules are not sufficient to justify denying recognition under subsection (b)(1), so long as the essential elements of impartial administration and basic procedural fairness have been provided in the foreign proceeding.

UFCMJRA § 4 cmt. 5 (citations and internal quotation marks omitted); *see also Tonga Air Services, Ltd. v. Fowler*, 826 P.2d 204, 209 (Wash. 1992) (finding that "due process of law" was satisfied under the predecessor to section 4(b)(1) of Washington's UFCMJRA where, *inter alia*, foreign law "impose[d] more onerous standards for the introduction of documentary evidence on foreigners" and there was no verbatim transcript of the foreign proceedings). Taken together, these two comments demonstrate that section 4(c)(8)—like section 4(b)(1)—requires only "basic" or "fundamental" fairness for a specific foreign proceeding to be "compatible with the requirements of due process of law."

Our conclusion that section 4(c)(8) requires only "fundamental fairness" is buttressed by the prefatory note to the UFCMJRA, which states that the act's purpose is to "make it more likely that money judgments rendered in that state would be recognized in other countries." Certainly, it would undermine this purpose to enforce only those foreign judgments which resulted from proceedings that conformed to our own notions of constitutional due process. *See Ashenden*, 233 F.3d at 476 (rejecting the argument that foreign courts should have to follow "the latest twist and turn

of our courts regarding, for example, the circumstances under which due process requires an opportunity for a hearing in advance of the deprivation of a substantive right rather than afterwards"). Such a high bar would encourage foreign powers to condition the enforcement of *our* judgments on the satisfaction of *their* procedural requirements, which could be just as onerous as our own.

We are unpersuaded by Holland America's analogy to the U.N. Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517 (the "New York Convention"). Article V, section 1(b) of that treaty states that recognition of a foreign arbitral award "may be refused" if, *inter alia*, "[t]he party against whom the award is invoked was not given proper notice of the . . . arbitration proceedings or was otherwise unable to present his case." As Holland America points out, at least two of our sister circuits have held that this language "essentially sanctions the application of the forum state's standards of due process." *Iran Aircraft Industries v. Avco Corp.*, 980 F.2d 141, 145 (2d Cir. 1992) (citing *Parsons & Whittemore Overseas Co. v. Societe Generale de L'Industrie du Papier (RAKTA)*, 508 F.2d 969, 975–76 (2d Cir. 1974)); *see also Generica Ltd. v. Pharm. Basics, Inc.*, 125 F.3d 1123, 1129–30 (7th Cir. 1997). According to Holland America, these cases demonstrate that "it is possible to apply an American due process analysis in individual proceedings just like this one."

Though it may be "possible" to apply American constitutional due-process standards here, we nonetheless decline to do so, because we think the New York Convention cases are distinguishable. Unlike the UFCMJRA, the New York Convention provides no guidance—in commentary or elsewhere—regarding the standards to apply in interpreting

section 1(b) of article V. Indeed, in *Parsons & Whittemore Overseas*, the seminal case on which Holland America's cited authority relies, the Second Circuit relied exclusively on a footnote in a law review article which highlights this fact:

> It should be noted that there is no specification of the standards for judging the propriety of the notice or the adequacy of the opportunity to be heard [under section 1(b) of article V]. . . . [I]t can be argued that the law chosen by the parties or the law of the rendering State should govern. On the other hand, the concept of due process is closely linked with the public policy of the forum, and it can be expected that the enforcing State will apply its own standards of due process."

Leonard V. Quigley, *Accession by the United States to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards*, 70 Yale L.J. 1049, 1082 n.81 (1961) (emphasis added). Here, we need not rely on "public policy" to determine the standard governing section 4(c)(8), because the text of the UFCMJRA's commentary provides the answer: "fundamental fairness."

In sum, both the commentary and prefatory note to the UFCMJRA demonstrate that under section 4(c)(8), courts ask only whether the party resisting judgment "was denied fundamental fairness in the particular proceedings leading to the foreign-country judgment," not whether the foreign proceedings literally conformed to the requirements of due process under our own Constitution. UFCMJRA § 4 cmt. 12. To demonstrate a lack of "fundamental fairness," the party resisting the judgment must point to more than mere

"procedural differences"—like a lack of trial by jury or "different evidentiary rules"—between the process that the party received in the foreign proceeding and the process to which it would have been entitled here. UFCMJRA § 4 cmt. 5. Rather, the party must establish a deprivation of "basic procedural fairness" by, for example, proffering evidence of "corruption" or that the foreign judgment was entered for "political reasons." *See* UFCMJRA § 4 cmt. 12. We proceed to consider whether Holland America has satisfied this standard with respect to the Dutch proceedings. Thus, it is not necessary for us to decide whether process accorded to Midbrook also passed muster under American standards of due process.[13]

## 2.   Holland America's Discovery Requests

First, Holland America argues that it was denied due process in the Dutch proceedings because the Alkmaar District Court and the Amsterdam Court of Appeal "denied [Holland America] access to a majority of Midbrook's cost records." Holland America cites no authority for the proposition that "fundamental fairness" requires that a litigant be afforded an opportunity for pretrial discovery, and we are aware of none. *See, e.g.*, *Ashenden*, 233 F.3d at 479–80 ("[T]he right to pretrial discovery is not a part of the U.S. concept of due process, let alone of international due process.") (internal citations omitted).

In any case, we need not decide whether it would violate fundamental fairness to deny a party the opportunity to take

---

[13] The "cardinal principle of judicial restraint" is that "if it is not necessary to decide more, it is necessary not to decide more." *PDK Labs. Inc. v. U.S. D.E.A.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in judgment).

*any* pretrial discovery, because here, Holland America was afforded *some* pretrial discovery. Instead of ordering Midbrook to produce all of its cost and banking records, as one of our federal district courts might have done, the Dutch courts ordered Holland America to identify specific records that it wished to discover and to explain why it needed them. Then, in each case where Holland America complied, the Dutch courts ordered Midbrook to produce documentation.

For example, although the Dutch courts repeatedly denied Holland America's requests for documentation substantiating *all* of the costs underlying Midbrook's invoices, the Alkmaar District Court afforded Holland America the opportunity to identify and explain "[the] amounts [that] Midbrook invoiced unjustifiably to [Holland America] and why." The court then ordered Midbrook to respond to Holland America's arguments with supporting documentation, and, after it received Midbrook's responses, it addressed Holland America's objections one by one.

Likewise, although the Dutch courts did not grant Holland America access to *all* of Midbrook's records related to the dollar and guilder accounts, the Amsterdam Court of Appeal *did* order Midbrook to produce the statements of those accounts. Then, it gave Holland America an opportunity to challenge the accuracy of those statements, addressed Holland America's objections one by one, granted several of them, and adjusted Midbrook's damages award accordingly. Far from comparing to "corruption" or the entry of judgment against Holland America for "political reasons," UFCMJRA § 4 cmt. 12, the Dutch courts' treatment of Holland America's discovery requests was a mere "procedural difference" that is insufficient to establish that the Dutch proceedings were fundamentally unfair.

Our conclusion is buttressed by the fact that not even constitutional due process—a standard which our sister circuits have recognized as being more demanding than "fundamental fairness"[14]—requires full pretrial discovery. *See, e.g.*, *N.L.R.B. v. Valley Mold Co.*, 530 F.2d 693, 695 (6th Cir. 1976) ("It is well settled that parties to judicial or quasi-judicial proceedings are not entitled to discovery as a matter of constitutional right."); *see also Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) ("There is no general constitutional right to discovery in a criminal case."); *Thomas v. Bible*, 896 F.2d 555 (9th Cir. 1990) (unpublished) ("There is . . . no constitutional right to pretrial discovery in administrative proceedings."). Indeed, there was no *statutory* right to full pretrial discovery in federal cases before the Federal Rules of Civil Procedure were enacted in 1938. *See, e.g.*, *Hickman v. Taylor*, 329 U.S. 495, 500 (1947) (describing "[t]he pre-trial deposition-discovery mechanism established by Rules 26 to 37" as "one of the most significant innovations of the Federal Rules of Civil Procedure"). Thus, given that Holland America would not have been entitled to full pretrial discovery even under our own constitutional

---

[14] In applying the "fundamental fairness" standard to evaluate foreign *judicial systems* under section 4(b)(1), our sister circuits have consistently recognized that constitutional due-process standards are more demanding. *See Society of Lloyd's v. Ashenden*, 233 F.3d 473, 477 (7th Cir. 2000) (interpreting the predecessor to section 4(b)(1) of Illinois's UFCMJRA as employing an "international concept of due process" that was "less demanding" than "the complex concept that has emerged from American case law"); *DeJoria v. Maghreb Petroleum Expl., S.A.*, 804 F.3d 373, 380 (5th Cir. 2015) (recognizing that under the predecessor to section 4(b)(1) of Texas's UFCMJRA, "the foreign judicial system must only be fundamentally fair" and "need not comply with the traditional rigors of American due process" (citations, alterations, and internal quotation marks omitted)); *Society of Lloyd's v. Reinhart*, 402 F.3d 982, 994–95 (10th Cir. 2005) (similar, regarding the predecessor to section 4(b)(1) of New Mexico's UFCMJRA).

standards, we have no difficulty holding that Holland America was not denied fundamental fairness in the Dutch proceedings.

### 3. Reversal of the Alkmaar District Court's Factual Finding and Credibility Determination

Next, Holland America argues that it was denied due process when the Amsterdam Court of Appeal overturned the Alkmaar District Court's factual finding denying the existence of the parties' alleged October 1999 settlement agreement without deferring to the district court's determination that the testimony of two of Midbrook's witnesses was not credible and thus vitiated any such settlement agreement.

Again, the authorities cited by Holland America fall far short of establishing that "fundamental fairness" requires a foreign appellate court to defer to a foreign trial court's factual findings. We also hesitate to insert our own rule of decision regarding the deference owed to trial court factual findings. *See United States v. Hinkson*, 585 F.3d 1247 (9th Cir. 2009).

In any case, we are convinced that Holland America was afforded fundamental fairness here, because the Amsterdam Court of Appeal gave a good reason for overturning the Alkmaar District Court's finding that the parties had reached no settlement agreement in October 1999. As the court of appeal explained:

> It is an established fact that a credit was issued by Midbrook for an amount of [] 100,000 [guilders]. [Holland America] does not declare in any way what consideration on

> its part stood against this credit. Considering the relationship between the parties . . . it is unlikely that Midbrook would not have demanded a certain consideration 'in exchange' for this credit. On the other hand, it is plausible that the parties would have wanted to clear up the past before working together for one final year.

Thus, the court of appeal's reversal of the district court's factual finding was based not only on its own evaluation of the credibility of Midbrook's witnesses, but also on the unexplained 100,000 guilder payment, which the court of appeal interpreted as a settlement of past accounts between the parties. Especially in light of this additional ground for reversal, the court of appeal's reversal reflects at most a mere "procedural difference" between U.S. and Dutch law, UFCMJRA § 4 cmt. 5, and was therefore fundamentally fair.

We are further persuaded of this conclusion because again, Holland America has failed to establish that even the more exacting standards of constitutional due process would have required a United States appellate court to defer to a trial court's factual determination under like circumstances. Most of the American cases cited by Holland America refer either expressly or impliedly to Federal Rule of Civil Procedure 52(a)(6), which provides that a district court's "[f]indings of fact . . . must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." *See, e.g.*, *Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985) ("[T]he standard governing appellate review of a district court's finding of discrimination is that set forth in Federal Rule of Civil Procedure 52(a) . . . .")). Rule 52 is a statutory rule, however, and none of Holland

America's cited authority establishes that the Constitution independently requires appellate courts to defer to trial-court factual findings. Thus, Holland America could claim no constitutional violation had an American appellate court taken the same action as the Amsterdam Court of Appeal, and this too suggests that the Dutch proceedings were fundamentally fair.

**B.  The District Court Did Not Abuse Its Discretion by Denying Holland America's Motion for Additional Discovery Under Federal Rule of Civil Procedure 56(d).**

Finally, Holland America argues that the district court abused its discretion by denying Holland America's request for additional discovery under Federal Rule of Civil Procedure 56(d). Rule 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . allow time to obtain affidavits or declarations or to take discovery." To prevail on a request for additional discovery under Rule 56(d), a party must show that "(1) it has set forth in affidavit form the specific facts it hopes to elicit from further discovery; (2) the facts sought exist; and (3) the sought-after facts are essential to oppose summary judgment." *Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*, 525 F.3d 822, 827 (9th Cir. 2008).

Here, the additional discovery that Holland America sought in its opposition to Midbrook's summary judgment motion was the same discovery that it sought in the Dutch proceedings: "Midbrook's underlying cost records and banking records[.]"As the district court noted, however, this discovery would not "preclude summary judgment," because it had no bearing on whether the proceedings in the Dutch courts were "compatible with the requirements of due

process of law" under section 4(c)(8) of Washington's UFCMJRA. Rather, Holland America sought this discovery because it would "conclusively determine whether Midbrook was in fact entitled to any judgment whatsoever in the Dutch proceedings." Because this fact was not relevant—let alone "essential"—to the issues raised by Midbrook's motion for summary judgment, the district court did not abuse its discretion by denying Holland America's request for additional discovery.

## IV. Conclusion

We **AFFIRM** the district court's order granting summary judgment for Midbrook and denying Holland America's discovery request under Rule 56(d).